# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MICHAEL ROMERO,

      **Plaintiff,**

v.                                                            CIV No. 10-0867 LH/DJS

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

      **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on cross motions for summary judgment.  The

Court, having considered the motions, briefs and relevant case law, concludes that the first motion,

Defendant Hartford Life and Accident Insurance Company's Motion for Summary Judgment

(Docket No. 39),[1] is **denied  in part and granted in part**.  Specifically, Defendant's motion is

denied in part, given the Court's conclusion that Mrs. Romero's death falls within the coverage of

the accidental death and dismemberment policy ("the Policy") at issue in this case.  Defendant's

motion is granted in part, insofar as it seeks dismissal of claims for bad faith and punitive damages.

The second motion, Plaintiff's Motion for Summary Judgment as to Count II of the

---

[1] Hereafter, Deft's Mot.Summ.J.

1

Complaint (Docket No. 40),[2] is also **granted in part and denied in part**.  Specifically, the Court concludes that the 2007 Coverage Increase Form was valid and operated to effectuate an increase in coverage under the Policy, but that the amount of coverage is reduced by 50% from the amount selected on the Coverage Increase Form.

## I.  Plaintiff's Claims

This case was properly removed from State Court, pursuant to diversity jurisdiction.  *See* 28 U.S.C. § 1332.  It involves an insurance coverage dispute arising out of an accidental death and dismemberment policy.  Plaintiff's mother, Mrs. Emma Romero, enrolled in the Policy in 1993, when she was seventy-four years old.  Mrs. Romero died in December 2009, after walking away from her mobile home in Capitan, New Mexico, and spending the night outside in freezing temperatures.

The Complaint for Bad Faith Breach of Insurance Contract (Docket No. 1-1) alleges:  a bad faith denial of Plaintiff's claim for payment under the Policy (Count I); that Hartford's failure to pay the value of the Policy is a breach of the insurance contract (Count II); and that Hartford is liable for punitive damages because its denial of Plaintiff's claim was done in bad faith and with a malicious intent (Count III).  As the purported beneficiary, Plaintiff claims that his mother's death qualifies as an "accident" under the Policy; that therefore benefits are payable to him; and, that Defendant Hartford ("Hartford") knew or should have known it was liable under the contract, yet has persisted in refusing to pay the benefits to Plaintiff.

---

[2]  Hereafter, Pl's Mot.Summ.J.

## II.  Undisputed Facts

### A.  Facts Stipulated to By the Parties

The Court has executed and entered a Pretrial Order jointly submitted by the parties on September 2, 2011 (Doc. No. 64).[3]  This Pretrial Order, pages 3-5, contains the following factual stipulations by the parties that are relevant to the Court's consideration of these motions:

1.  Emma Romero was enrolled in an Accidental Death and Dismemberment Policy ("policy") which is the subject of this lawsuit.
2.  Hartford Life and Accident Insurance Company ("Hartford") is the underwriter for the insurance policy.
3.  At the time of Emma Romero's death, Hartford was the underwriter for the policy.
4.  Plaintiff filed a timely claim for benefits under the policy.
5.  Plaintiff notified Hartford of his claim for benefits under the policy prior to January 18, 2010.
6.  Hartford timely denied Plaintiff's claim for benefits under the policy.
7.  Hartford's denial was based upon its claim that Mrs. Romero's death did not result from accidental injury independent of all other causes because she died due to cold exposure not resulting from a forced landing, stranding, sinking, or wrecking of a conveyance in which Mrs. Romero was an occupant at the time of the exposure.
8.  The Death Certificate for Mrs. Romero is admissible in evidence.
9.  Mrs. Romero was born in 1918.
10.  When she was approximately seventy-four years old, she [Mrs. Romero] enrolled in an Accident Insurance program through Ruidoso State Bank on April 18, 1993.
11.  On October 9, 2007, a Coverage Increase Request form bearing the signature of "Emma Romero" was submitted to First Federal Bank increasing the coverage on the policy to $300,000.00.
12.  The Coverage Increase Request Form designates Plaintiff as Beneficiary of the insurance benefits.
13.  Under the signature line bearing the signature of Emma Romero on the Coverage Increase Request Form, it states "Benefits reduce 50% at age 70 or older."
14.  The Coverage Increase Request Form is admissible in evidence.
15.  On or about December 1, 2009, Mrs. Romero left her home in Capitan, New Mexico to take a walk outside.
16.  Mrs. Romero was Plaintiff's mother.
17.  The overnight temperature in Capitan that night was in the 20's Fahrenheit.

---

[3]  The Court has not changed the substantive portions of this Order, however it deleted Section "X. Trial Preparation" in its entirety, anticipating that pre-trial deadlines would be imposed by a Trial Notice, if necessary.

18.  The next morning, Plaintiff discovered that Mrs. Romero was not at home and reported her missing to the Capitan Police Department.

19.  Later in the day, a search and rescue team found Mrs. Romero dead under a tree that was less than a mile from her home.

20.  When she was found, Mrs. Romero was wearing wet pajama pants, underwear, socks, black athletic shoes, two sweaters, and a hooded sweatshirt.  She was not wearing a coat.

21.  Mrs. Romero was 90 years old at the time that she died.

22.  Dr. R. Ross Reichard performed the autopsy on Mrs. Romero.  He concluded that Mrs. Romero's death was caused by environmental cold exposure. . . .


### B.  Undisputed Facts Established by Documentary Evidence in the Record

Additional undisputed facts are as follows:  The parties agree that the Policy states that when a covered "injury" results in loss of life of an insured person within 365 days after the date of the "accident," Hartford will pay the principal sum applicable to the insured person.  The definition section of the Policy defines "injury" as:  bodily injury resulting directly from accident and independently of all other causes which occur while the Covered Person is covered under the policy.  (Deft's Mot.Summ.J, Undisp. Mat. Fact ("UMF") No. 26; Cert. of Insurance, Deft's Ex. K).

Contained in the  Certificate of Death is the "Cause of Death" section, defined as "[e]vents such as diseases, injuries or complications that directly caused the death."  (Deft's Ex. A).  "Environmental Cold Exposure" is listed as the cause of death.  (*Id*.).  This Certificate states:  "Other significant conditions contributing to death" were "Arteriosclerotic Cardiovascular Disease, Dementia."  (*Id*.).  Similarly, the Autopsy Report states that Mrs. Romero "died of environmental cold exposure.  Other significant contributory causes are dementia and atherosclerotic cardiovascular disease." (Deft's Ex. G).  This report concludes by saying that the "manner of death is accident."  (*Id*.)  It also noted that Mrs. Romero had a subscalpular hematoma.  (*Id*)

4

The Report of Findings of the Office of the Medical Investigator states that the cause of death is "Environmental cold exposure" and the manner of death is "accident." (Deft's Ex. H).  Dr. Reichard, who performed the autopsy, testified at his deposition that his use of the term "accident" was not related in any way to definitions of the term "accident," as it is used in insurance policies.  (Deft's Ex. I, Reichard Depo. at 9).  Dr. Reichard testified that, in his opinion, the cause of death was due to exposure to cold.  (*Id*. at 13).

### III.  Legal Standards

In ruling on a motion for summary judgment, the Court will never weigh the evidence or find the facts.  Instead, the Court's role under Rule 56 is narrowly limited to assessing the threshold issue of whether a genuine dispute exists as to material facts requiring a trial.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

New Mexico's substantive insurance law governs in this diversity action.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Insurance contracts are construed by the same principles that govern the interpretation of all contracts.  *See Rummel v. Lexington Ins. Co*., 123 N.M. 752, 758 (1997).  The Court must consider the  plain language of the relevant provisions, "giving meaning and significance to each word or phrase within the context of the entire contract, as objective evidence of the parties' mutual expression of assent." *H-B-S Partnership v. Aircoa Hospitality Servs., Inc*., 137 N.M. 626, 632 (2005).  An insurance policy is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary and popular sense.  *Vihstadt v. Travelers Ins. Co*., 103 N.M. 465, 466 (1985).  "It is a cardinal principle of insurance law that a policy or contract of insurance is to be construed liberally in favor of insured or his beneficiary and strictly as

against insurer.  Also, words, phrases or terms will be given their ordinary meaning unless by definitions in the policy or context in which the word is used requires some other meaning be given."  *Scott v. New Empire Ins. Co*., 75 N.M. 81, 84 (1965)(*quotation omitted*).

## IV.  Applicable Language of the Policy.

The Court finds the following portions of the Policy to be relevant to its consideration of this issue.

The Certificate of Insurance[4] states:

> **"Definitions:  Injury** means bodily injury resulting *directly from accident and independently of all other causes* which occurs while the Covered Person is covered under the Policy.  Loss resulting from: a) sickness or disease, except a pus-forming infection which occurs through an accidental wound; or b) medical or surgical treatment of a sickness or disease; is not considered as resulting from injury."

Docket No. 1-4 at 14 (emphasis added).

According to the Certificate of Insurance, the Policy also excludes coverage under eight specific circumstances, one of which is loss due to intentional self-inflicted injury. (*See id*. at 15).[5]  Finally, the Certificate of Insurance sets forth what percentage of the "Principal Sum" Hartford will pay, depending upon the type of injury sustained by a Covered Person.  (*Id*.).  For example, "100% Principal Sum" will be paid for loss of life. This section contains a *presumption* of injury, under limited circumstances, where loss due to exposure occurs.  (*Id*.)  "Exposure to the elements will be presumed to be Injury if:  a) it

---

[4]  The Certificate of Insurance states that it summarizes the provisions of the Policy that are important.

[5]  Hartford does not deny coverage in this case under any of these exclusions.

results from a forced landing, stranding, sinking or wrecking of a conveyance in which the

Covered Person was an occupant at the time of the accident; and b) the Policy would have

covered Injury resulting from the accident." (*Id*. at 16).

Because satisfaction of the policy requirements is a prerequisite to the right to

benefits under the policy, proof of these requirements, including the proof of an accident in

this case, is Plaintiff's burden of proof.  Plaintiff therefore has the burden of establishing that

Mrs. Romero experienced "bodily injury resulting directly from accident and independently

of all other causes...."  In its motion, Hartford challenges Plaintiff's ability to meet this

burden of proof.


**V.  The Policy Provides Coverage for This Death**

### A.  It is Undisputed That Mrs. Romero's Death Resulted Directly From an Accident

#### (1)  Plaintiff's Position

As noted above, it is incumbent upon Plaintiff to prove that Mrs. Romero died as a

result of a bodily injury caused by accident.

The Autopsy Report (Deft's Ex. G) states that Mrs. Romero "died of environmental

cold exposure," as does the Report of the Office of the Medical Investigator (Deft's Ex. H).

Dr. Reichard, who performed the autopsy, stated that, in his opinion, the cause of death was

due to exposure to cold.  (Deft's Ex. I, Reichard Depo. at 9).  This undisputed evidence does

not resolve the issue of whether or not Mrs. Romero's death due to exposure was the result

of an accident.

Plaintiff contends that, because the policy does not define the term "accident," that

7

this Court must look to how New Mexico courts have defined this term. Plaintiff states that "it is clear that in New Mexico, 'accident' means an unexpected, unintended, and un-designed mishap." *See Britt v. Phoenix Indem. Ins. Co*, 120 N.M. 813, 816 (1995)(accident found if the event causing the injury is unintended and unexpected from the injured party's point of view). (Pltf's Resp. at 7). The crux of Plaintiff's argument is that, "[i]n this case, it is clear that Mrs. Romero did not intend, expect or design her death by environmental cold exposure. More important is the fact that Defendant has not brought any evidence or argument showing that Mrs. Romero did intend, design, or expect her death." (*Id*.).

### (2)  Hartford's Position

Hartford argues that Mrs. Romero's death due to exposure is not an accidental injury "as it is simply the natural result of a voluntary act, i.e., taking a walk in freezing weather without a coat and sitting under a tree in the snow." (Deft's Mot. Summ.J. at 12). Hartford argues that Mrs. Romero did not experience a fall, was not struck by a vehicle, person or animal, nor did she suffer a work or home-related injury. Citing the Court to the *Vihstadt* case, 103 N.M. at 466, Hartford argues that there was no unlooked-for mishap or event that was not expected or designed. Hartford cites the Court to no evidence in support of its position.

### (3)  Analysis of the Court

Given the absence of a definition in the Policy, this Court will rely on its understanding of the ordinary meaning of the word "accident." BLACK'S LAW DICTIONARY 15(6th ed. 1990) defines accident as "an event which under the circumstances is unusual and

8

unexpected by the person to whom it happens. ...”  This is basically the definition that the parties agree is applied by New Mexico courts.  “To decide if an injury was an accident, New Mexico courts will examine the accidental or intentional quality of the precise event or act causing injury.”  *Sena v. Travelers Ins. Co*., 801 F.Supp 471, 474 (D.N.M. 1992)).

According to Rule 56, summary judgment is granted if “there is no genuine dispute as to any material fact.”   The material facts regarding whether Mrs. Romero’s death from exposure resulted directly from an accident are facts that would be probative as to what Mrs. Romero intended or expected or could foresee to be the result of leaving her home for an extended period without adequate clothing for the weather conditions.  Such proof is problematic, given that Mrs. Romero obviously cannot testify as to what, if anything, she intended, expected or foresaw.  Mere arguments of counsel on this issue are not sufficient.

The deposition of Dr. Reichard, the doctor who performed the autopsy, provides evidence as to whether or not the event causing the injury was “unintended and unexpected from the injured party’s point of view.” (Deft’s Ex. I).  In testifying that the death was caused by exposure to the cold, Dr. Reichard noted that dementia and heart disease contributed to the death.  (*Id*.at 13).  He noted that Mrs. Romero would be predisposed or more susceptible to a cold environment because of her heart disease, and that having heart disease contributed to how quickly she succumbed to the cold environment.  *Id.*.  Relevant to the accident issue, Dr. Reichard stated that Mrs. Romero “essentially got into the situation she was in and was unable to extricate herself from that situation . . . because of her dementia.”  (*Id.* at 7).  He was asked if it was disorientation that *got her to the place* where she was found and he stated that his opinion was, “Yes, exactly.  That she’s there, she’s lost and confused or can’t find her way out because of being demented.”  *Id.*.  Finally, he testified

9

that if Mrs. Romero had not been exposed to the cold environment that day, it would be unlikely that either heart disease or dementia or both would have killed her.  *Id*. at 18.

Dr. Reichard's conclusions were based upon the "gross examination" and "microscopic evaluation" performed during the autopsy.  He concluded that Mrs. Romero had features of two pathologies, i.e., "a mixed dementia where she has both Alzheimer's Disease and a second type of dementia known as Lewy body dementia or Lewy body disease."  (*Id*. at 6).  He also noted that she had a clinical history of dementia.  (*Id*.).

Other evidence in the record that suggests an accident, and that Mrs. Romero could have fallen or been injured and unable to extricate herself from this freezing environment, includes facts that she had minor trauma to her body, including a hematoma on the back of her head and red discoloration of her knees.  (*Id*. at 10-11).

This is the sum total of proof.  Admittedly it is indirect proof, in that it does not come from testimony from Mrs. Romero as to her intent or expectation on the day in question. The Court acknowledges that these types of cases are not subject to easy proof.  Cases involving whether a death was accidental are frequently resolved upon this type of circumstantial evidence.

For example, in *Scott v. New Empire Ins. Co.*, 75 N.M. 81 (1965) the Supreme Court affirmed a directed verdict, concluding that a fatal automobile crash was an "accidental death," based on only this evidence:  plaintiff, the insured, was normally a careful driver, that he had been driving fast before his misfortune and had actually received a traffic ticket for speeding earlier the same night, that he had driven this mountain road twice before, but never at night, and that his passenger, who was asleep at the time of the crash, had earlier complained about the speed at which the insured had been driving earlier in the evening.

10

Based on this evidence, the Supreme Court concluded that there was "no testimony that the misfortune which occurred to the decedent was intentional – heedless, perhaps, but certainly not voluntarily self-inflicted,..." *Id.* at 86.  In its review of the trial court's directed verdict for plaintiff, the Supreme Court held that "minds of reasonable men could not differ in concluding that the deceased died as a result of an accident." *Id.*

It is noteworthy that Hartford has not excluded this death from coverage under its suicide provision, and does not actively assert that this was an intentional death.  Hartford's primary argument seems to be that voluntary exposure to danger, resulting in death, cannot be considered an "accident."  This argument has been rejected by New Mexico courts.  *See e.g., Scott v. New Empire Ins. Co.*, 75 N.M. 81; *Vallejos v. Colonial Life and Accident Ins. Co.*, 91 N.M. 137, 139 (1977)("When a person dies from the injection or consumption of narcotics without the intention to injure himself or commit suicide, his death is considered an accident, or brought by 'accidental means.'").  The seemingly innocuous and everyday act of voluntarily leaving one's residence, does not provide the answer as to whether or not an accidental death occurred thereafter.

The Court concludes that the testimony of Dr. Reichard establishes that Mrs. Romero did not intend, design or expect her death, and that there is no evidence in the record to the contrary.  Accordingly, the Court concludes that Mrs. Romero died as a result of a bodily injury caused by accident and that this is an undisputed fact.

**B.  It Is Undisputed That Mrs. Romero's Bodily Injury Resulted Independently of All Other Causes (i.e., Other than Exposure)**

As noted above, to qualify as a covered injury, bodily injury must result directly from

an accident and *independently of all other causes.* The Court has concluded that Mrs. Romero's death resulted from an accident. It is now incumbent upon the Court to evaluate whether this death resulted independently of all other causes.

Hartford contends that cardiovascular disease and dimentia were contributory causes or factors in Mrs. Romero's death, and that, therefore, her death due to exposure was not independent of all other causes.

Testimony from Dr. Reichard is the only evidence on this issue. As noted above, Dr. Reichard testified clearly that the cause of death was due to exposure to the cold. (Deft's Ex. I at 13). When asked if heart disease and/or dementia contributed to or caused the death, he testified: "They weren't the cause of death or I would have put them as the cause of death. They contributed or were a factor into the death, but they weren't the cause of death."

New Mexico courts have construed this type of language previously in the context of accidental loss insurance policies, deciding what effect must be given to phrases similar to that in the Policy before the Court, i.e., "independently of all other causes." As noted by Plaintiff, the New Mexico Supreme Court has disposed of an insurance company's attempts to deny coverage due to the presence in an insured of other medical conditions. In *Armijo v. World Insurance Co*., 78 N.M. 204, 205 (1967), the Supreme Court held that liability for loss arises if the accident is the proximate efficient cause of the loss, and that liability cannot be limited to situations where the accident was literally the sole cause of death. The Court noted that Black's Law Dictionary defines "proximate" as meaning "nearest and closest in causal connection" and that "efficient cause" is defined in Webster's Third New International Dictionary as "the immediate agent in the production of an effect."

Bearing in mind these definitions that have been accepted by the New Mexico

12

Supreme Court, it is clear that the environmental cold exposure was the proximate efficient cause of Mrs. Romero's death.  When asked, Dr. Reichard testified that if Mrs. Romero had not been exposed to the cold environment that day, it would be unlikely that either heart disease or dementia or both would have killed her.  (Deft's Ex. I. at 18).  When asked to assign a percentage of causation, he testified that environmental cold exposure was greater than 50% and that heart disease and dementia were less than that.  (Reichard's Depo. at 15-16, Docket No. 46-1).

Given this undisputed evidence, it is clear that the environmental cold exposure was the proximate efficient cause of Mrs. Romero's death. It is also clear that Hartford cannot show that either the arteriosclerotic cardiovascular disease or dementia, or both, were immediate agents in producing her death. Hartford cannot show that these two pre-existing conditions were the nearest and closest in causal connection to her death.  Accordingly, there is no dispute of fact that Mrs. Romero's death due to cold exposure, an accidental death, resulted independently of all other causes.  Hartford's attempts to deny coverage is denied in this respect as well.


### C.  Mrs. Romero's Exposure to the Elements Is a Covered Injury Even Though a Conveyance Was Not Involved

The policy language at issue here states: "Exposure to the elements will be presumed to be Injury if:  a) it results from a forced landing, stranding, sinking or wrecking of a conveyance in which the Covered Person was an occupant at the time of the accident; and b) the Policy would have covered Injury resulting from the accident."

Hartford contends that the policy provisions must be read together as a whole, and

that interpretation of the policy cannot be done in a manner that renders certain policy provisions superfluous.  Specifically, Hartford contends that the only logical way to read the policy is to conclude that a limited grant of coverage is provided, in the event of exposure, *only when* exposure is connected to an accident where an insured is an occupant of a conveyance.  Hartford's position is that, if exposure to the elements is considered an "accident" under the Policy generally, there would be no need to define exposure resulting from accidents in a conveyance as an "accident" because they would already be covered. In other words, Hartford asserts that coverage is extended to injury due to accident exposure, *only where the insured is an occupant of a conveyance.*  (Deft's Mot.Summ.J. at 12).

An argument along these lines may be appropriate where exclusion language is being construed[6], however it does not make sense when presumption language is at stake.  The clear language of this policy is that a presumption of coverage is created when the insured is the occupant of a conveyance.  Such a reading of this language does not make the conveyance language superfluous and does not lead to the conclusion that coverage will be denied if the insured is not the occupant of a conveyance.  The Court concludes that Hartford's assertion that coverage for an accidental death due to exposure can only exist if the insured is an occupant of a conveyance, is not, as asserted by Hartford, a "common-sense" reading of the policy as a whole, nor is it supported by the case law cited by Hartford. For these reasons, Hartford's arguments, asking the Court to conclude that Mrs. Romero did not experience an injury covered by the Policy, are rejected.

For all the reasons set forth herein, the Court concludes that Mrs. Romero sustained

---

[6]  *See Davis v. Farmers Ins. Co.*, 240 N.M. 249 (2006).

14

a bodily injury that falls within the coverage of the Policy.

## VI.  Amount of Insurance Benefit to Be Paid to Plaintiff

### A.  Undisputed Facts Relating to the Coverage Increase Form

Given the Court's conclusions up to this point, the amount of the insurance proceeds to be paid under the Policy becomes a relevant inquiry.

The validity and legal effect of a 2007 Coverage Increase Form ("the Form") remains a matter of dispute before the Court.  (Deft's Ex. D).  Benefits under the Policy changed several times over the years that Mrs. Romero was enrolled in it.  The most recent purported change was a  coverage increase in 2007 from $1,000 to $300,000.  Plaintiff claims that Hartford sent his mother the Form inviting her to increase her coverage, and that either she signed it, or that perhaps he signed her name on it, acting with a power of attorney on her behalf.

The name "Emma Romero" is written on the signature line of the Form, followed by the date "10-09-07."  In a rectangle at the top of the Form are four amounts of additional coverage available.  There is a check mark next to the highest option – $300,000.  Beneath this rectangle is a line where the name of beneficiary should be printed.  On this line, the name "Michael A. Romero" is written, and beneath that, the word "Son" is written on a line following the word "Relationship."  Beneath that is the following language:  "Charge Authorization: By enrolling in the insurance plan, I authorize my Financial Institution and its Service Provider to automatically charge my account quarterly according to the rate schedule for any additional coverage I select."  The following words appear below the signature line: "Benefits reduce 50% at age 70 or older."

15

According to Hartford's records, (Docket No. 42 at 35), it received increased quarterly premiums from Mrs. Romero, beginning after the Form was submitted, in December 2007, until December 2009.

### B.  Plaintiff's Position

Plaintiff's position is that regardless of who signed the Form (i.e., he or his mother), the legal effect is the same:  the Form is valid to effectuate an increase in coverage to $300,000.  It is undisputed that on March 14, 1997, Mrs. Romero granted a Durable Power of Attorney ("DPOA") to Plaintiff, Michael Romero, for many specified purposes, including "insurance transactions."  (*See* Pltf's Ex. B, Docket No. 41-2).  This DPOA was prepared by an attorney.  The Coverage Increase Form was executed approximately 9 ½ years later, on October 9, 2007.  There is no evidence that the DPOA was not in force in October of 2007, nor does Hartford dispute the validity of it.

### C.  Hartford's Position

In its response brief, Hartford disputes that Mrs. Romero is a "covered person" entitled to benefits of $300,000 under the Policy, on grounds that Mrs. Romero did not sign the Form and that Plaintiff did not properly sign the Form as her agent, because he did not indicate on the Form that he was an agent acting on behalf of Mrs. Romero.  In making this argument, Hartford relies on a New Mexico statutory form, "The New Mexico Statutory Form Power of Attorney Important Information," N.M.S.A. §46B-1-301 (2007).  This has a section entitled, "Agent's Duties," which states that the agent must disclose his/her identity as an agent whenever he/she acts for the principal, by writing or printing the name of the

16

principal and signing his/her own name as "agent."  A document created in this statutory format "may be used to create a statutory power of attorney that has meaning and effect prescribed by the Uniform Power of Attorney Act."

Hartford makes the following arguments, urging the Court to conclude that there is a material issue of fact regarding the authenticity and validity of the Coverage Increase Form:  (1) that Plaintiff merely signing his mother's name on the signature line of the Form does not comply with §46B-1-301; (2) that Plaintiff testified that his mother signed the Form and that he recognized her signature on it, but then later argues that it is immaterial who signed the Form because he had a power of attorney; and, (3)  that Plaintiff forged Mrs. Romero's signature on the Form.  (Deft's Resp. to Pltf's Mot. for Summ.J. at 11-12).

Hartford previously sought to extend the discovery period, to enable it to disclose a handwriting expert, raising the issue at that time of whether or not the Form contained an authentic signature of Mrs. Romero.  Hartford contends that it has retained a document examiner as an additional expert witness, whose opinion is that the signature on the Form was written by Plaintiff and not by Mrs. Romero.  This motion to extend discovery was denied by United States Magistrate Judge Svet, on grounds that the opinion of this expert was not relevant at that stage of the proceedings, given that it was unnecessary to a determination of the coverage issues pending on summary judgment.  MEM.OP.AND ORDER (Docket No. 49), entered on July 19, 2011.  This decision was affirmed by this Court (Docket No.  65).

### D.  Analysis of the Court

As noted above, Hartford disputes the validity of the Form and would like a further

17

opportunity to conduct discovery to prove that the signature on the Form was not written by Mrs. Romero, but rather, by her son, Plaintiff Michael Romero.  The Court agrees with the Plaintiff, for the reasons that follow, that it is irrelevant whether Mrs. Romero or Michael Romero signed the Form, given the undisputed existence of the 1997 DPOA, wherein Mrs. Romero granted authority to Michael Romero to conduct insurance transactions on her behalf.[7]

Assuming Michael Romero signed the Form, Hartford is correct – he did not comply with  §46B-1-301, because he did not indicate in writing that he was signing it as agent for his mother.  Hartford cites the Court to no authority for the proposition that Michael Romero's failure to perform his "duties," as set forth in this statutory form, invalidates the Form, or operates to extinguish the principal/agent relationship that was created by the 1997 DPOA.

Hartford cites the Court to no deficiency in the DPOA itself and, having reviewed it, the Court accepts it as a valid creation of authority from Mrs. Romero to her son, for him to act on her behalf, specifically in insurance transactions, such as in execution of the Coverage Increase Form.

New Mexico case law recognizes the ability of one party to designate another to act on her behalf, even at times if the agency relationship is created orally.  *DeBaca, Inc. v. Montoya*, 91 N.M. 419, 420 (1978).  Here, we have a written DPOA – which expressly authorized Michael Romero (the agent) to represent Mrs. Romero (the principal) in dealings

_____

[7] Of course, if Mrs. Romero signed the Form, there is no issue as to the propriety of its execution. It is in the situation where Plaintiff signed the Form that an issue of validity arises, and it is this situation that the Court will address.

with third persons, in insurance transactions.  Michael Romero had actual authority.  *See*

*Barron v. Evangelical Lutheran Good Samaritan Society*, 2011 WL 4809827 (N.M.App.).

Subsequent to execution and submission of the Form, Mrs. Romero was obviously bound

to the terms of it, as evidenced by the fact that higher premiums were automatically

withdrawn from her bank account.  Further, Hartford cites no prejudice it has suffered,

occasioned by Michael Romero's failure to disclose his identity as an agent.  Hartford

accepted increased premiums, made through automatic withdrawals from Mrs. Romero's

bank account, for two years, until her death.

For these reasons, the Court concludes that failure by Michael Romero to perform

the "Agent's Duties" spelled out in §46B-1-301 does not operate to extinguish the agency

relationship created by the DPOA.  Regardless of whether Mrs. Romero or Michael Romero

signed the Form, it was validly executed.


### E.  Provision Reduces Benefit by 50%

Having concluded that the Form was validly executed, the Court must now address

the amount of coverage to which Plaintiff is entitled.    Plaintiff asks this Court to declare

the policy to be worth $322,000 and to declare that the 50% reduction of benefits provision

on the form is inoperable.

Plaintiff's arguments are that the Form, on its face, appears to allow Mrs. Romero

to increase her coverage to $300,000.  Further, Plaintiff argues that Mrs. Romero was 88

years old when she received the Form, which was an age which, according to Hartford,

rendered her ineligible to receive the highest choice for coverage listed on the form, i.e.,

$300,000.  Plaintiff contends that the only notice Hartford gave to Mrs. Romero, that the

19

benefits reduced by 50% at age 70, was in very small print, quoted above, on the Form.

As noted above, Hartford disputes the validity of the Form, but alternatively argues that, if valid, the Form clearly limits the benefits by 50%, because Mrs. Romero was older than 70 years of age when the Form was executed.  In addition to the limiting language on the Form, Hartford claims that it informed Mrs. Romero of this 50% reduction in coverage in each of the following documents:  October 5, 2007 correspondence from Hartford to Mrs. Romero (Ex. 1 to Deft's Resp. to Pltf's Mot. Summ.J., Docket No. 44-1); AD&D Policy schedule (Docket No. 44-6); and, Certificate of Insurance (Docket No. 44-7).

The Court has reviewed the insurance documents upon which Hartford relies, and agrees that they are unambiguous and clearly state that benefits are reduced by 50% for insured individuals who are age 70 and older.

In New Mexico, insureds are presumed to have read their insurance policies and if no objection is made, to accept its terms.  *See Western Farm Bureau Mutual Ins. v. Barela*, 79 N.M. 149, 151 (1968).

For these reasons, the Court concludes that Mrs. Romero is entitled to an increase in coverage, as indicated on the Form, but that the 50% reduction of benefits provision is applicable.


**VIII.  Bad Faith Claim**

Under New Mexico law, where payment of policy proceeds depends on an issue of law or fact that is fairly debatable, the insurer is entitled to debate the issue.  *See generally United Nuclear Corp. v. Allendale Mut. Ins. Co*., 103 N.M. 480 (1985).  Before an insurer can be found to have acted in bad faith for its denial in the payment of benefits, it must be

20

shown that the insurer acted unreasonably or without proper cause.  *See* UJI 13-1702 (2011) NMRA (stating that an "insurance company does not act in bad faith by denying a claim for reasons which are reasonable under the terms of the policy").  Although the Court has concluded that the undisputed facts establish that Plaintiff is entitled to benefits under the AD&D policy, there are no facts before the Court to establish that Hartford acted unreasonably or in bad faith in denying these benefits.  "Bad faith" has been defined in New Mexico as "any frivolous or unfounded refusal to pay."  *Sloan v. State Farm Mut. Auto. Ins. Co.*, 135 N.M. 106, 108 (2004).  Plaintiff's claims for bad faith and punitive damages are without factual basis and are therefore, **denied.**

## VII.  Conclusion

For the reasons stated herein, the Court has decided that Mrs. Romero's death falls within the coverage of the Policy, in that it was a bodily injury resulting directly from accident and independently of all other causes, and that it was a covered injury even though Mrs. Romero was not the occupant of a conveyance.  In addition, the Court concludes that the Coverage Increase Form was validly executed and operated to effectuate an increase in coverage under the Policy, but that the amount of coverage is reduced by 50% from the amount selected on the Coverage Increase Form.  Finally, the Court finds no factual basis for Plaintiff's claims for bad faith and punitive damages.

**WHEREFORE, IT IS HEREBY ORDERED THAT** Defendant Hartford Life and Accident Insurance Company's Motion for Summary Judgment (Docket No. 39) is **denied in part and granted in part**.  Specifically, Hartford's motion is denied in part, given the Court's conclusion that Mrs. Romero's death falls within the coverage of the accidental

death and dismemberment policy ("the Policy") at issue in this case. Hartford's motion is granted in part, insofar as it seeks dismissal of claims for bad faith and punitive damages.

**IT IS FURTHER ORDERED** that the second motion, Plaintiff's Motion for Summary Judgment as to Count II of the Complaint (Docket No. 40), is also **granted in part and denied in part**. Specifically, the Court concludes that the 2007 Coverage Increase Form was valid and operated to effectuate an increase in coverage under the Policy, but that the amount of coverage is reduced by 50% from the amount selected on the Coverage Increase Form.

**IT IS FURTHER ORDERED** that this matter is **dismissed** and that judgment shall be entered in favor of Plaintiff, in the amount of 50% of the coverage amount ($300,000) indicated on the Coverage Increase Form. Mrs. Romero's accidental death occurred in December 2009, and the Court is uninformed as to the current, exact amount of proceeds that is due to her beneficiary under the Policy[8]. Accordingly, Defendant Hartford shall submit a Final Judgment, approved by both parties, to the Court for its entry, reflecting the sum certain that is due to Plaintiff, on or before December 14, 2011.

   **IT IS SO ORDERED.**

_____
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[8] Plaintiff has frequently mentioned that under Hartford's calculation of the benefits at 50%, the Policy is worth $161,000, which of course is not 50% of $300,000.

22